IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 2000 Session

**STATE OF TENNESSEE v. DARRELL DODSON**

**Appeal from the Criminal Court for White County**
**No. CR79      Leon C. Burns, Jr., Judge**

---

**No. M1998-00067-CCA-R3-CD - Decided April 14, 2000**

---

Following a jury trial, the Defendant was convicted of aggravated rape. He now appeals as of right from his conviction, raising the following six issues for our review: (1) Whether the evidence is sufficient to support his convictions; (2) Whether the trial court erred in failing to require the State to elect between the numerous alleged incidents of rape presented in the proof, thus depriving the Defendant of a unanimous jury verdict; (3) Whether the trial court erred in failing to grant an acquittal based upon insufficient showing of venue; (4) Whether the trial court erred in excluding the testimony of the counselor who would have corroborated the impotence of the Defendant based upon a statement of the Defendant made three months prior to the alleged rape; (5) Whether the conviction should be reversed based upon improper and prejudicial statements by the prosecutor; and (6) Whether the prejudicial effect of the testimony of Cheryl Carter outweighed the relevance of such testimony and whether such testimony was inadmissible under Tenn. R. Crim. P. 404(b). The State concedes that the trial court erred in failing to require the State to elect between the multiple incidents of rape presented in the proof, thereby depriving the Defendant of a unanimous jury verdict. Because we agree that the trial judge so erred, we reverse the Defendant's conviction and remand for a new trial. The remainder of the Defendant's issues are without merit.

**T. R. A. P. 3 Appeal as of Right; Judgment of the Trial Court Reversed; Remanded**

David H. Welles, Judge, delivered the opinion of the court, in which Jerry L. Smith, Judge, and Thomas T. Woodall, Judge, joined.

John Drake, Murfreesboro, Tennessee, for the appellant, Darrell Dodson.

Paul G. Summers, Attorney General and Reporter, Lucian D. Geise, Assistant Attorney General, Bill Gibson, District Attorney General, and William M. Locke, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTS

At trial, the victim, Cynthia Samford, testified that on the evening of August 25, 1996, she was attending a dinner social at the residence of her friend, Cheryl Carter. Among the guests at Ms. Carter's residence was the Defendant, whom the victim knew because he was a friend of her ex-husband. Around 5:00 or 5:30 that evening, the victim agreed to accompany the Defendant to the store to get some beer. After going to the store, they went to the house of Mary Mabe, where they continued socializing and drank some beer. The victim testified that she left Ms. Mabe's house briefly with Danny Tollison, who wanted to talk to her. She said that they "just rode down to the road and back." When the Defendant and the victim were on their way back to Ms. Carter's house, they encountered a person the Defendant knew walking down the road. The victim was unsure whether the person was Jeffrey Mace or Gregory Allen Matheney, but she thought it was Mr. Mace. The Defendant took the person to the person's trailer, where they socialized further. Upon leaving the trailer, the Defendant and the victim were accompanied by Jeffrey Mace and Gregory Allen Matheney. The Defendant told the victim that they were going to the store to buy cigarettes.

The victim testified that instead of driving to the store for cigarettes, the Defendant drove to a dark, wooded area and exited the car in order to "relieve himself." The victim exited the car for the same purpose, but when she did, the Defendant was standing over her. She said the Defendant told her to "drop her drawers." At first she thought the Defendant was joking, but his expression informed her otherwise. The Defendant "jerked" her pants down. She said that the Defendant entered her vaginally as she was pushed against the car. She begged Mr. Mace and Mr. Matheney to help her, but they just stood there with their heads down. At some point, the two men surrounded her.

The victim said that the Defendant grabbed her by the hair and hit her head against the window of the car. After that, he forced her to give him oral sex, telling her to "sink some teeth into it." While she was giving the Defendant oral sex, she felt "hands all over her." The other two men were touching her with their hands and their mouths. One of the two other men, either Mr. Mace or Mr. Matheney, entered her vaginally during this time. One of them attempted to enter her anally, but she broke down into tears and begged him to stop. She said that the Defendant did not ejaculate into her, but the other person who entered her did. She did not know whether the Defendant had an erection while he was raping her. She testified, "I guess; I don't know. I wasn't enjoying anything. I wasn't looking at that. I just know that he was inside me."

The victim testified that she convinced the three men that if they drove her back to town, she would have sex with them again. As they neared a convenience store in Cookeville where they planned to stop, the victim became afraid that the Defendant would not stop at the store, so she jumped out of the still-moving car and ran inside. Once inside, she informed the cashier that she had been raped by three men. The cashier called the police and would not let the three men take her away. The police arrived and arrested the three men in the parking lot.

The cashier from the convenience store, Kenneth L. Pass, testified that he was working on the evening of August 25, 1996 when the victim came into the store covered in mud and scratches and bleeding from the scratches. He said that she was upset and crying, and she told him she had been raped by three men. He let her come behind the counter and told her he would protect her. Three men then came into the store. Mr. Pass identified one of the three men as the Defendant. He said that the Defendant was also covered in mud when he entered the store. One of the men went to the restroom, one went to get beer, and the Defendant tried to get the victim to come out from behind the counter. Mr. Pass testified that the three men gathered in a little group and had a small discussion; then all three tried to come behind the counter to take the victim away. Mr. Pass refused to let the men behind the counter, and he called the police.

Don Wilson testified that he is a lieutenant with the White County Sheriff's Department. He was called to investigate an allegation of rape. The victim told him that she was raped by three men, including the Defendant. Lt. Wilson saw the Defendant that evening, and he testified that the Defendant was not wearing a shirt and that he had mud on him. He said that the victim had mud and scratches on her legs and a bruise on her throat. She was nervous, frightened, and trembling. She was crying at times.

Lt. Wilson investigated where the alleged rape occurred. The victim was unsure of the exact location, but she described turns that the Defendant made. Lt. Wilson determined that all of the places the Defendant and the victim visited that evening were in White County. From the victim's description of the turns made after leaving the trailer, Lt. Wilson determined that the Defendant either drove toward the Indian Mound area, which is on the edge of White and DeKalb Counties, or toward the Cedar Creek area, which is further into White County. He said, "The best I could tell from her description, they probably turned back toward Cedar Creek. I don't know exactly where the alleged incident took place, but the best I could determine it occurred in White County."

Cheryl Carter, the person whom the victim was originally visiting on the evening of August 25, testified that the victim left her home that evening with the Defendant to go to the store. They called her from Mary Mabe's house and said that they would be back soon, but they did not return. Ms. Carter testified that sometime later she saw the Defendant, and he told her that she was a "lucky woman" because the victim "was in the gun sights and the only reason the man didn't pull the trigger or the person didn't pull the trigger was because [Ms. Carter] walked in front of [the victim]." Ms. Carter further testified that around July or August of 1998, she saw the Defendant at her boyfriend's house. She said they were talking, and the Defendant stated that "he wasn't worried about it anyway, all he got out of it was a blow job."

The defense called Mary Mabe, who testified that the victim and the Defendant came to her house on the evening of August 25, 1996. She said that the victim left for about forty-five minutes to an hour with a man named Danny Tollison. When the victim returned, she asked Ms. Mabe if Ms. Mabe was angry at her for leaving with Mr. Tollison, to which Ms. Mabe responded that she was not angry.

Samera Zavaro then testified that she is employed with the Tennessee Bureau of Investigation crime laboratory in Nashville in the serology section. She said that she received blood samples from all three men and samples from a rape kit which was performed on the victim. The rape kit included blood samples, vaginal samples, saliva samples, and hair samples. Ms. Zavaro testified that the vaginal sample was positive for sperm and for semen, so DNA tests were performed on the sample. The first test performed on the vaginal sample was inconclusive, so Ms. Zavaro attempted to do another test on the sample which remained. The only results she found with her test were results "consistent with the victim." When asked why she was unable to get any results from the sperm, Ms. Zavaro responded,

> Well, there's different scenarios. The sample could have been degraded or maybe there was an insufficient amount of sample. These are the two main scenarios. And things can degrade over time. They can degrade if they're not stored properly. And these would cause me not to be able to get results. Also, if there wasn't enough sperm on the swabbings after they'd already been tested for the RFLP test, I may not have had enough left for my testing.

Ms. Zavaro explained that time was one factor in degradation, but not the only factor. The "normal window of opportunity" for testing sperm is seventy-two hours. She agreed with counsel that if the sample was properly taken within five or six hours of the alleged rape, then degradation should have been at a minimum. She also said that she could not pinpoint the reason why she did not get any results. It could have been either degradation or an insufficient amount of sperm.

Marsha Kay Stewart, a registered nurse at White County Hospital, testified that she saw the victim on the night of August 25, 1996 for a rape evaluation. She said that she took samples from the victim with a "rape kit." She testified that she properly took and preserved the samples.

Cassandra M. Dodson, the Defendant's wife, testified that she married the Defendant on December 19, 1996. She said that she and the Defendant have never had sexual intercourse because the Defendant is impotent. She testified that she has never seen the Defendant with an erection and that the Defendant has seen two doctors in an attempt to remedy the problem.

## SUFFICIENCY OF THE EVIDENCE

The Defendant first argues that the evidence was insufficient to support the conviction. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. McBee v. State, 372

S.W.2d 173, 176 (Tenn. 1963); see also State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992) (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1976), and State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977)); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Holt v. State, 357 S.W.2d 57, 61 (Tenn. 1962).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914 (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978)). The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191 (citing Cabbage, 571 S.W.2d at 836). Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. Tuggle, 639 S.W.2d at 914.

To establish that the Defendant was guilty of aggravated rape, the State was required to prove that the Defendant unlawfully sexually penetrated the victim, that he was aided or abetted by one or more other persons, and that force or coercion was used to accomplish the act. See Tenn. Code Ann. § 39-13-502. "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Id. § 39-13-501(7).

The victim testified to two different instances of sexual penetration by the Defendant: one vaginally and one orally. Both are unlawful sexual penetration; as such, both penetrations could give rise to a conviction of aggravated rape. See id.; State v. Phillips, 924 S.W.2d 662, 664-65 (Tenn. 1996). The victim also testified that the Defendant forced her to engage in both instances of penetration. She said that Mr. Mace and Mr. Matheney surrounded her and that while the Defendant was forcing her to perform fellatio, the two men had their hands all over her, and one of them entered her vaginally.

Based on this testimony, we believe that the evidence was sufficient to support the conviction of aggravated rape. The record clearly establishes two unlawful penetrations and that the Defendant forced the victim to engage in those penetrations. The record also establishes that the Defendant was aided and abetted by Mr. Mace and Mr. Matheney during the penetrations. The victim testified that while she was performing fellatio on the Defendant, the other two men had their hands and mouths "all over" her, and one of them entered her vaginally. The Defendant's argument that the other men were merely participating rather than aiding or abetting during this incident is unpersuasive. Slightly more confusing is the testimony regarding what Mr. Mace and Mr. Matheney were doing during the first incident of sexual penetration when the Defendant vaginally entered the victim. The victim testified that she begged them to help her, but they just stood there with their heads down. She then said that they surrounded her. It is unclear when they surrounded her. The Defendant argues that they surrounded her after the original penetration was over. However, we believe a jury could have rationally concluded that Mr. Mace and Mr. Matheney were aiding and abetting the Defendant during the first encounter by remaining nearby and then surrounding her to prevent escape.

Notwithstanding, the Defendant argues in his brief that the evidence was insufficient because (1) there was no DNA evidence linking the Defendant, Mr. Mace, or Mr. Matheney to the rape; (2) the vaginal intercourse as testified to by the victim was impossible because of the respective heights of the parties and because the Defendant was impotent; (3) the testimony of the victim contained inconsistencies; and (4) the State did not prove the Defendant was aided and abetted by Mr. Mace and Mr. Matheney.

We have already determined that the State proved the Defendant was aided and abetted by Mr. Mace and Mr. Matheney. We will, however, briefly address the Defendant's other contentions. Addressing first the DNA evidence, we note that while the DNA tests did not positively link the Defendant or his companions to the rape, they also did not exclude the Defendant or his companions as perpetrators of rape. The first test performed on the sperm collected was "inconclusive," and the second test did not produce any results. Contrary to the Defendant's assertion that the second test produced no results because the sperm was "too degraded," the testimony at trial indicated that the lack of results could have been caused by either degradation of the sperm or an insufficient amount of sperm. Ms. Zavaro testified that she could not determine why she did not get any results in the second test. Without any proof whatsoever, the Defendant asks us to speculate that the sperm collected from the victim came from Danny Tollison, as opposed to Mr. Mace or Mr. Matheney, because the victim was alone with Mr. Tollison during the evening of the alleged rape. He argues that, because the "tryst" with Mr. Tollison occurred prior to the alleged rape, the sperm would have been degraded, which caused the results found in the DNA testing. Without going into detail, we note that such an argument is completely contrary to the evidence. Not only was there no evidence that the victim engaged in sexual relations with Mr. Tollison, but Ms. Zavaro testified that the normal window of opportunity to find sperm in a victim is seventy-two hours. There was no proof that the sperm would have been degraded if deposited over five hours before the time of collection, as argued by the Defendant.

We also reject the Defendant's argument that it was impossible for the Defendant to rape the victim while standing up because of the respective heights of the Defendant and the victim. Likewise, we reject the theory that the rape was impossible because the Defendant was impotent. Any inconsistencies in the testimony are for the jury to resolve, and the jury apparently resolved any impotence-related questions in favor of the State. Also, any inconsistencies in the victim's testimony were for the jury to resolve, which it resolved in favor of the State. We will not find the evidence insufficient because a victim cannot remember every detail about a night in which she asserts she was raped. Accordingly, we hold that the evidence was sufficient to find the Defendant guilty beyond a reasonable doubt of aggravated rape.

ELECTION OF OFFENSES

In a somewhat related issue, the Defendant argues that the trial court committed reversible error by failing to require the State to elect upon which instance of sexual penetration it was relying

for conviction. The State concedes on appeal that this is reversible error. We agree and accordingly must reverse the Defendant's conviction and remand for a new trial.

In Burlison v. State, 501 S.W.2d 801 (Tenn. 1973), our supreme court held that when the proof shows multiple offenses which could each sustain the allegations of the criminal charge, it is "the duty of the trial judge to require the State, at the close of its proof-in-chief, to elect the particular offense of carnal knowledge upon which it would rely for conviction, and to properly instruct the jury so that the verdict of every juror would be united on the one offense." Id. at 804. This requirement is "fundamental, immediately touching the constitutional rights of an accused, and should not depend upon his demand therefor." Id. The supreme court in Burlison maintained that election is necessary to (1) enable the defendant to prepare for and make his defense to a specific charge, (2) protect the defendant from double jeopardy by individualizing the issue, and (3) prevent a less than unanimous jury verdict in which some jurors convict on one offense and others on another. Id. at 803.

Later, in State v. Shelton, 851 S.W.2d 134 (Tenn. 1993), our supreme court found the first two reasons espoused by Burlison to be insignificant because "election at the end of the state's proof does little to aid the defendant in preparing his defense" and because a defendant is protected against double jeopardy for the same type of offense or offenses charged during the entire period covered in the indictment. Id. at 137. It found the most serious concern to be the state constitutional requirement that a criminal conviction can only result from a unanimous jury verdict. Id. When a jury is allowed to choose for itself the incidents upon which it will convict, the court cannot be assured that the jury's verdict is unanimous. Id. The court thus reaffirmed the obligation of the trial court to require the State to elect the particular offense or offenses for which convictions are sought and to instruct the jury in such a manner as to assure that the jury deliberates over and returns a verdict for a particular offense, instead of creating a "'patchwork verdict'" in which some jurors convict on one offense while others convict on another. Id. (quoting State v. Brown, 823 S.W.2d 576, 583 (Tenn. Crim. App. 1991)). An appellate court's finding that the evidence is sufficient to support convictions for any of the offenses in evidence is an "inadequate substitute" for a jury's deliberation over the specific offenses. Id. at 138.

In this case, the victim testified to two different types and separate instances of penetration: vaginal and oral. Either penetration would support the Defendant's aggravated rape conviction. See Tenn. Code Ann. §§ 39-13-501(7), 39-13-502. As our supreme court noted in State v. Phillips, 924 S.W.2d 662 (Tenn. 1996),

> "[A]lthough separate acts of intercourse may be so related as to constitute one criminal offense, generally rape is not a continuous offense, but each act of intercourse constitutes a distinct and separate offense." Moreover, each of the above-described acts is separately defined in Tenn. Code Ann. § 39-13-501(7) as a discrete type of sexual penetration subsumed by Tenn. Code Ann. § 39-13-502, the aggravated rape statute. Each act, in our opinion, is capable of producing its own

attendant fear, humiliation, pain, and damage to the victim. Each type of penetration requires a purposeful act on the part of the perpetrator.

Id. at 664-65 (quoting 75 C.J.S. Rape § 4 (1952 & Supp. 1995)) (citations omitted). Because two separate penetrations, each of which would support the conviction of aggravated rape, were entered into evidence, and because the Defendant was only charged with one count of aggravated rape, we must hold that the trial court erred in failing to require the State to elect upon which offense it was relying for conviction.

In some circumstances, the evidence may be of such a nature that the failure to elect offenses and give an appropriate instruction is harmless beyond a reasonable doubt. See Shelton, 851 S.W.2d at 138. Like the election requirement itself, harmless error has typically been addressed in the context of child sexual abuse cases where the child witness has testified to multiple instances of sexual conduct occurring on different days over a period of time. In situations where the child witness testified to one instance of sexual contact with particularity but also made minor references to other instances, the minor references, in the context of the election requirement, have been held to be harmless. See id.; Tidwell v. State, 922 S.W.2d 497, 502 (Tenn. 1996); State v. Clabo, 905 S.W.2d 197, 204-05 (Tenn. Crim. App. 1995). For example, in Shelton, the supreme court found the failure to elect offenses to be harmless with respect to one of the victims, "A," because although "A" testified in very general terms that the defendant had digitally penetrated her and her two sisters on more than one occasion, she testified in detail to one incident that occurred on her birthday when the defendant was partially successful at his attempt to penetrate her with his penis. Shelton, 851 S.W.2d at 138. The supreme court stated,

[W]e conclude that the jurors must have considered the evidence of this particular incident in convicting the defendant of aggravated rape. We therefore conclude that the Burlison error as to this conviction was harmless beyond a reasonable doubt and affirm the judgment on this count.

Id.

While we have found no supreme court cases on point, we have found cases from this Court finding harmless error where there was distinct testimony about multiple instances of penetration and the multiple instances occurred during one criminal episode. See State v. Johnny LaCurtis Phillips, C.C.A. No. 02C01-9307-CC-00160, 1994 WL 592050, at *9 (Tenn. Crim. App., Jackson, Oct. 26,1994), aff'd, 924 S.W.2d 662 (Tenn. 1996)[1]; State v. Buster Wayne Hicks, C.C.A. No. 03C01-9212-CR-00421, 1994 WL 327764, at *6-8 (Tenn. Crim. App., Knoxville, July 7, 1994); State v. Frank Frierson, C.C.A. No. 01C01-9112-CC-00357, 1993 WL 273974, at *24-25 (Tenn. Crim. App.,

---

[1]Although the supreme court granted permission to appeal and affirmed our decision, it did not address the failure to elect between the multiple instances of penetration. Instead, it addressed only the double jeopardy issue raised by the defendant regarding the multiple convictions arising out of the same criminal episode. See Phillips, 924 S.W.2d at 664.

Nashville, July 22, 1993). An example of the harmless error analysis in this context can be found in State v. Johnny LaCurtis Phillips, a case in which the defendant was charged and convicted of three counts of aggravated rape. Phillips, 1994 WL 592050, at *1. The victim testified that the defendant broke into her house and committed multiple rapes on her while he was armed with a knife. Id. She testified to five different penetrations occurring over a three-hour period: she testified that the defendant inserted a hard plastic object into her vagina, that he performed oral sex on her, that he inserted his penis into her vagina, that he performed oral sex on her again, and that he inserted his penis into her vagina again. Id. The defendant was charged in a three-count indictment, and the State indicated that it was relying on the insertion of the object, oral sex, and vaginal sex for conviction. Id. at *7. Although we found the failure to further elect between the multiple offenses of oral and vaginal sex to be error, we found that error to be harmless. Id. at *9. In so doing, we stated,

> [R]elative to the multiple acts of intercourse and cunnilingus, as well as the several types of sexual penetration, we believe that the evidence was of such quality that no risk existed that the verdicts were less than unanimous and that any failure in election and instruction was harmless beyond a reasonable doubt. The defendant asserted an alibi and focused solely upon the victim's ability to identify her assailant. Neither his cross-examination of the victim nor his other development of the evidence related in any fashion to an attack on the victim's testimony about the nature and number of sexual penetrations which occurred. The victim's testimony about the events and their sequence was direct, clear and certain. It was equally strong as to each of the five sexual penetrations and the only issue of the victim's credibility arose in the context of the reliability of her identifying the defendant. In other words, the jury's return of guilty verdicts shows that they accredited the victim's testimony and the evidence does not warrant, beyond idle speculation, any inference that any juror had a reasonable doubt about any of the five penetrations occurring. The verdicts were proper.

Id.

Conversely, in State v. Clabo, 905 S.W.2d 197 (Tenn. Crim. App. 1995), we were unable to find the failure to elect between multiple offenses to be harmless beyond a reasonable doubt with respect to one of the victims. Id. at 205. The defendant in Clabo was convicted of two counts of aggravated sexual battery and one count of aggravated rape. Id. at 199. The victims were two children, both age ten. Id. at 200. One of the victims, N, testified that the defendant asked him to accompany the defendant to the bathroom, where the defendant fondled N's genitals and performed oral sex on him. Id. The defendant then pinned N against the sink and inserted his penis into N's anus. Id. The fondling of N's genitals was the basis for one of the counts of sexual battery, so no election was required. Id. at 205. With respect to the aggravated rape conviction, we found

> that the trial court did err in failing to request an election of offenses in connection with the charge of aggravated rape of N. The State provided proof that the defendant

performed oral and anal sex on the victim. These are two separate acts, each constituting penetration under the charge of aggravated rape. Yet, the defendant was only charged with one count of aggravated rape. The court presented to the jury the proof and allegations of two acts and asked the jury if the defendant could be convicted of one count of this act. Therefore, some jurors could have concluded that the defendant was guilty based upon the proof of the oral sex and not the anal sex, and some jurors could have concluded that the defendant was guilty based upon the proof of the anal sex and not the oral sex. The defendant may have been convicted by a jury of less than twelve (12). Since all twelve (12) members did not have to find the same facts or draw the same conclusions, we find that a grave constitutional error was committed in that the defendant may have been denied a unanimous jury verdict.

We cannot say that this error was harmless beyond a doubt. Prior to trial, the defendant moved to prevent the State from introducing proof concerning the oral sex incident. The State argued and the trial judge agreed that either the oral sex or the anal penetration constituted aggravated sexual rape. Further the State, in its summation to the jury, argued that the defendant performed oral sex on the victim and had anally penetrated the victim. The trial judge expressly charged the jury to rely on the arguments of counsel for each side's theory of the case. The jury instructions defined sexual penetration as including fellatio and anal intercourse.

Id.

Although unfortunate for the victim in this case, we are unable to conclude that the failure to elect between the two penetrations was harmless beyond a reasonable doubt. Albeit unlikely, it is possible that some jurors convicted the Defendant based on the vaginal intercourse while others convicted based on the oral sex. As in Clabo, the jury instructions defined sexual penetration as including oral sex and intercourse. The jury was never informed that it must render a unanimous verdict regarding either the oral sex or the vaginal intercourse. The prosecutor discussed both the oral sex and vaginal intercourse during closing argument. Also, the Defendant presented evidence that he was impotent, thus at least calling into question the ability of the Defendant to engage in vaginal intercourse. In addition, the Defendant asserted that the vaginal intercourse could not be aggravated rape because he was not aided and abetted by others during this penetration. Although we rejected this argument in assessing the sufficiency of the evidence, we acknowledge that the proof on this issue was somewhat confusing, which could have prevented a unanimous jury verdict with respect to both penetrations. We reluctantly conclude that the evidence presented here precludes application of the harmless error analysis approved in Phillips, where the evidence was equally strong as to each of the penetrations. See Phillips, 1994 WL 592050, at *9.

The result of this case is all the more unfortunate because it was so easily preventable. Our courts have repeatedly emphasized that the State must elect between multiple offenses. See State v. Brown, 992 S.W.2d 389 (Tenn. 1999); State v. Walton, 958 S.W.2d 724 (Tenn. 1997); Tidwell

v. State, 922 S.W.2d 497 (Tenn. 1997); State v. Shelton, 851 S.W.2d 134 (Tenn. 1993); State v. Brown, 762 S.W.2d 135 (Tenn. 1988); Burlison v. State, 501 S.W.2d 801 (Tenn. 1973).

In State v. Walton, 958 S.W.2d 724 (Tenn. 1997), our supreme court had granted the Defendant's application for review regarding sentencing issues only. The Court reversed the convictions, however, after finding the State's failure to properly elect offenses to be plain error. Id. at 726. In State v. Brown, 992 S.W.2d 389 (Tenn. 1999), our supreme court reversed a conviction for rape of a child, concluding that reversal was required because "the prosecutor failed to properly elect the offense upon which it [sic] sought to base the defendant's conviction." Id. at 393.

There is no reason in a case such as this for the State to fail to elect between offenses. Because of this error, the State has conceded on appeal that this case should be reversed and remanded for a new trial.

VENUE

Next, the Defendant asserts that the State failed to establish venue in White County. We disagree. Without question, a criminal defendant has a constitutional right to a trial by an impartial jury chosen from the county in which the crime was committed. Tenn. Const. art. I, § 9. Consequently, proof of venue is required to establish jurisdiction. See Harvey v. State, 376 S.W.2d 497, 498 (Tenn. 1964); Hopson v. State, 299 S.W.2d 11, 14 (Tenn. 1957). However, venue is not an element of the offense charged, so it must only be proven by a preponderance of the evidence. State v. Bennett, 549 S.W.2d 949 (Tenn. 1977); Harvey, 376 S.W.2d at 498. Venue may be proven by circumstantial evidence, and even slight evidence is sufficient if uncontradicted. Bennett, 549 S.W.2d at 949-50. A jury is entitled to draw reasonable inferences from proven facts to establish venue. Id.; Hopson, 299 S.W.2d at 14. Pure speculation as to venue will not satisfy the preponderance of the evidence standard. State v. Bloodsaw, 746 S.W.2d 722, 725 (Tenn. Crim. App. 1987).

In this case, the victim testified to the various residences she visited on the evening of the offense, but she was unable to pinpoint the location where the offense occurred. She testified that she did not know where she was when she was raped. Nevertheless, Lt. Wilson of the White County Sheriff's Department testified that he began investigating the rape soon after it occurred. Although the victim was unable to inform Lt. Wilson of road names, she was able to describe the turns that the Defendant had made while driving. She also told Lt. Wilson the places she had been that evening. Lt. Wilson determined that all of the places the Defendant and the victim visited that evening were in White County. From the victim's description of the turns made after leaving the last location, Lt. Wilson determined that the Defendant either drove toward the Indian Mound area, which is on the edge of White and DeKalb Counties, or toward the Cedar Creek area, which is further into White County. He said, "The best I could tell from her description, they probably turned back toward Cedar Creek. I don't know exactly where the alleged incident took place, but the best I could determine it occurred in White County." Although the Defendant cross-examined Lt. Wilson

on his investigation of the location of the rape, he did not offer any evidence to contradict Lt. Wilson's testimony that the offense occurred in White County.

On appeal, the Defendant urges us to conclude that Lt. Wilson's testimony as to the location of the rape was "mere speculation" and thus not sufficient to establish venue. We decline to do so. An officer's rational belief that a crime occurred within a given county can meet the burden of proof to show proper venue. See State v. Chadwick, 750 S.W.2d 161, 165 (Tenn. Crim. App. 1987); State v. Richard Burt McKee, C.C.A. No. 01C01-9606-CC-00278, 1998 WL 155558, at *9 (Tenn. Crim. App., Nashville, Mar. 31, 1998). Lt. Wilson explained his investigation and how he determined that the offense more than likely occurred in White County. We believe that a rational jury could infer from this testimony that the offense did indeed occur in White County. The Defendant offered no evidence to contradict this conclusion. We therefore hold that the State met its burden of proving venue in White County.

## TESTIMONY OF ANN FRANKLIN

The Defendant argues that the trial court erred in excluding the testimony of Ann Franklin, who would have testified that the Defendant told her three months prior to the alleged rape that he was impotent. Ms. Franklin was called as a witness for the defense. After the prosecutor objected to the questioning of Ms. Franklin, the trial court conducted a jury-out hearing to determine what Ms. Franklin's testimony would be. Ms. Franklin testified that she met the Defendant in 1987 when she was employed as a counselor with Plateau Mental Health Center. Among other duties, she worked with persons in the alcohol and drug program, in which the Defendant was enrolled. Ms. Franklin said that she and the Defendant became friends over the years and that she has been his "confidante" on several occasions. In May of 1996, the Defendant came to her as a "friend" and told her that he was having problems with impotence. Ms. Franklin suggested various ways that the Defendant could get help for his problem.

At trial, the Defendant argued that, although the testimony of Ms. Franklin was hearsay, it should be admissible as "kin to an admission against interest." The trial court rejected this argument, found the testimony to be inadmissible hearsay, and excluded the testimony. On appeal, the Defendant has abandoned his original argument, and he argues instead that the testimony should have been admitted as either a statement of a then existing physical condition or a statement for the purposes of medical diagnosis and treatment. It is well-settled that a defendant cannot change grounds for objections from the trial court to the appellate court. State v. Brewer, 932 S.W.2d 1, 9 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 781 (Tenn. Crim. App. 1990); State v. Aucoin, 756 S.W.2d 705, 715 (Tenn. Crim. App. 1988). Such action constitutes waiver of the issue. Id. Nevertheless, we have considered the Defendant's argument, and we conclude that it lacks merit.

Tennessee Rule of Evidence 803(3) provides the following exception to the hearsay rule: A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a

statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

The Defendant argues that Ms. Franklin's testimony should be excepted from the hearsay rule because it was a statement of a "then existing physical condition." We disagree.

A well-known treatise on Tennessee evidence law provides the following discussion of this hearsay exception as applied to physical conditions:

> In order to apply this rule accurately, one must distinguish statements of present pain or health, governed by both Rules 803(3) and 803(4), from statements of past bodily condition, a category governed by the far more restrictive provisions of Rule 803(4). . . . The sole limitation [of Rule 803(3)] is that the content of the statement be confined to then existing pain or bodily health, not medical history. An example of a proper offer would be:
>
> > To prove that Declarant endured pain and suffering, Witness testifies: "I heard Declarant say, 'My leg hurts.'"

Neil P. Cohen et al., Tennessee Law of Evidence § 803(3).6, at 548 (3rd ed. 1995). Of great importance in this rule is that the condition be "then existing." It cannot be a statement of medical history. See id. We believe that the Defendant's statement to Ms. Franklin that he was having impotence problems was a statement of medical history, not a bodily condition that was occurring at the time he made the statement. Accordingly, the statement cannot qualify as a "then existing physical condition."

The Defendant also argues that the statement should be excepted from the hearsay rule because it was a statement made for the purposes of medical diagnosis and treatment. Tennessee Rule of Evidence 803(4) provides the following exception to the hearsay rule:

> Statements made for purposes of medical diagnosis and treatment describing medical history; past or present symptoms, pain, or sensations; or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis and treatment.

Although this type of statement is generally made to a physician, it may be made to another person, so long as it is for the purposes of both medical diagnosis and treatment. See State v. Gordon, 952 S.W.2d 817, 823 (Tenn. 1997) (statement of child sexual abuse victim to psychologist was for the purposes of medical diagnosis and treatment when it was the clinic's standard procedure for a psychologist, social worker, or nurse practitioner to interview child and obtain medical history for use in subsequent physical examination and treatment); State v. Hunter, 926 S.W.2d 744, 746-47 (Tenn. Crim. App. 1995) (statement of child sexual abuse victim to social worker was for purposes of medical diagnosis and treatment when it was clinic's standard procedure for social worker to

interview child and obtain medical history for use in subsequent physical examination and treatment); cf. State v. Barone, 852 S.W.2d 216, 219-20 (Tenn. 1993) (statement of child sexual abuse victim to psychologist was not for purposes of medical diagnosis and treatment because statement was for treatment of psychological health, not physical health). The rationale behind this exception "is that such declarations are deemed reliable because the declarant is motivated to tell the truth; that is, the declarant makes the statements for the ultimate purpose of receiving proper diagnosis and treatment." State v. Livingston, 907 S.W.2d 392, 396 (Tenn. 1995).

According to Ms. Franklin, the Defendant in this case made a statement about a medical condition: impotence. However, the Defendant did not establish that the statement was made for the purposes of both medical diagnosis and treatment. Although Ms. Franklin was once the Defendant's counselor, at the time the Defendant made the statement, they were just friends. The Defendant went to Ms. Franklin as a "friend" and "confidante," but not as a medical professional. There was no evidence that the Defendant wanted Ms. Franklin to diagnose or treat his problem, and Ms. Franklin did not do so. The record before us only establishes that the Defendant discussed a problem with a friend; it does not establish that he sought medical diagnosis and treatment from that friend or that the statement to her would be used in the medical diagnosis and treatment made by another. See Gordon, 952 S.W.2d at 823; Hunter, 926 S.W.2d at 746-47. Consequently, the Defendant failed to establish an exception to the hearsay rule.

Finally, the Defendant argues that the trial court should have allowed Ms. Franklin's testimony because the State "opened the door" to such testimony by emphasizing through the Defendant's wife that she only knew of the Defendant's impotence beginning in December 1996, four months after the alleged rape. We know of no hearsay exception which would permit hearsay testimony because such testimony would be beneficial in rebuttal. This issue has no merit.

## PROSECUTORIAL MISCONDUCT

The Defendant asserts that his convictions should be reversed because the prosecutor committed misconduct by making improper comments during closing argument and by improperly bolstering the victim's credibility by stating, "her story stands," in response to the trial court's question of whether the prosecutor wanted any re-direct examination of the victim. The Defendant did not, however, object to these comments. Failure to make a contemporaneous objection waives consideration by this Court of the issue on appeal. See Tenn. R. App. P. 36(a); State v. Killebrew, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988). Therefore, we will not address this issue.

## BAD ACT EVIDENCE

Finally, the Defendant argues that the trial court erred in admitting the testimony of Cheryl Carter to the effect that the Defendant solicited someone to harm or kill the victim. Specifically, Ms. Carter testified that the Defendant told her that an individual had the victim "in the gun sights," and the only reason the person did not shoot the victim was because Ms. Carter walked in front of the victim. However, as in the previous issue, the Defendant did not object to this testimony at the time

it was made. Failure to make a contemporaneous objection waives consideration by this Court of the issue on appeal. See id. Consequently, we will not address the Defendant's contention on appeal.

## CONCLUSION

As the State concedes, we conclude that the trial court committed reversible error by failing to require the State to elect the particular instance of sexual penetration upon which it was relying for conviction. Accordingly, we reverse the Defendant's conviction of aggravated rape and remand the case for a new trial.

Judge David H. Welles
Judge Jerry L. Smith
Judge Thomas T. Woodall
